UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Jared Stanzione,

     Plaintiff,

     v.                                Civil Action No. 2:14-cv-224

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

     Defendant.

## OPINION AND ORDER
(Docs. 12, 15)

Plaintiff Jared Stanzione brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Stanzione's motion to reverse the Commissioner's decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 15). For the reasons stated below, Stanzione's motion is GRANTED, in part; the Commissioner's motion is DENIED; and the matter is REMANDED for further proceedings and a new decision.

## Background

Stanzione was 29 years old on his alleged disability onset date of December 28, 2008. He has a high school education, and has held many jobs, including as a carpenter, a construction worker, a wreath maker, and a garbage collector. (AR 26, 38–39, 193.)

He testified that he quit most of these jobs after having problems understanding and getting along with supervisors and coworkers, resulting in him "being very violent and angry." (AR 543; *see* AR 330, 547.) In 2008, he was "let go" of his most recent job, which involved setting up and running machines for Newport Furniture Parts, a wood furniture manufacturer. (AR 233, 542.)

Stanzione was born in New Jersey. In 1982, when he was a toddler, his family moved to Island Pond, Vermont, to join a religious community called The Twelve Tribes. (AR 214, 329, 445.) While there, Stanzione was separated from his family because the cult[1] believed it was not beneficial for children to live with their parents. (AR 445.) Stanzione was educated by the cult until fourth grade, when his father took him and his siblings and left the cult, entering the children into the public school system. (AR 264, 329, 445.) Stanzione experienced difficulty in school, struggling academically and having problems sitting still and paying attention; he was thus placed in special education classes. (*Id.*; AR 323, 543–44.) In May 2009, consulting psychiatrist Robert Linder, MD, recorded that, while living in the cult, Stanzione was beaten with a rod, spanked with a paddle, and starved every Sunday. (AR 322.) Dr. Linder further recorded that Stanzione lived in a foster home for a period, where he was also "spanked and beaten with a paddle" and "told . . . the devil was in him." (AR 323.) In August 2009, consulting psychologist Patricia Stone, PhD, recorded that Stanzione "experienced a great deal of trauma while involved with the Church, because he had a difficult time learning."

---

[1] The Island Pond religious community is consistently described by Stanzione as a cult. (See, e.g. AR 214.)

(AR 329.)  In October 2010, Stanzione's treating nurse practitioner, Wendy Berman, APRN (Advanced Practice Registered Nurse), noted that Stanzione "has a long history of abuse by the church in Island Pond where he grew up."  (AR 789.)  In December 2012, Stanzione's treating mental health counselor, Gretchen Lewis, LCMHC, stated in a treatment note: "It is sadly clear that [Stanzione] had no maternal bonding and was forced into very difficult situations way too young.  Furthermore, it seems clear that [Stanzione] had mental health and cognitive struggles at a young age and was given no support." (AR 797.)

In September 2009, Stanzione was living with his father, sister, and her sister's two children ages three and six.  (AR 328.)  By December 2010, when the first administrative hearing in this matter was held, Stanzione was living with only his father. (AR 34.)  At the second administrative hearing, held in April 2013, Stanzione testified that his sister no longer lived with him and his father because Stanzione "was always getting angry at her and throwing stuff at her."  (AR 548.)  He explained that fighting within the family, especially involving him, "drove [his sister] away."  (*Id.*)  He further testified that he had problems getting along with supervisors, coworkers, medical providers, and his attorney.  (AR 547–48.)  This testimony is supported by NP Berman's October 2010 treatment note stating that Stanzione "can have a very explosive disorder" and has "continuing issues with paranoia around medical issues."  (AR 789.)  Berman also stated that Stanzione had "legal issues" and "minimal social and family supports." (*Id.*)  Stanzione's "legal issues" include 2009 charges for Burglary and Petty Larceny, for

which Stanzione spent 15 days in jail and received four years of probation.  (AR 318, 328, 566–67.)

In August 2009, Stanzione filed applications for supplemental security income and disability insurance benefits, alleging that he has been unable to work since December 28, 2008 due to posttraumatic stress disorder (PTSD), depression, attention deficit hyperactivity disorder (ADHD), compulsive behavior, and a thyroid disorder.  (AR 186.) He explained that he "ha[s] a hard time understanding other people[,] . . . ha[s] a difficult time communicating with other[s][, and] do[es] not get . . . along with others."  (*Id.*)  His applications were denied initially and upon reconsideration, and he timely requested an administrative hearing.  On December 3, 2010, Administrative Law Judge (ALJ) Thomas Merrill conducted a hearing on Stanzione's disability application.  (AR 22–51.) Stanzione appeared and testified, and was represented by counsel.  A vocational expert (VE) also testified at the hearing.  On February 4, 2011, the ALJ issued a decision finding that Stanzione was not disabled under the Social Security Act from December 28, 2008 through the date of the decision.  (AR 7–16.)  Approximately three months later, the Decision Review Board issued a notice stating that it had not completed its review of the case in the time allowed, and thus the ALJ's decision became the final decision of the Commissioner.  (AR 1–3.)  Stanzione filed a timely appeal with this Court, and on April 26, 2012, the Court issued an Order remanding the matter for further administrative proceedings (Remand Order), as requested in the parties' "Assented-to Motion for Voluntary Remand and Entry of Final Judgment under Sentence Four of 42 U.S.C. § 405(g)."  (AR 570–73.)  Soon thereafter, pursuant to the Court's Remand Order, the

Appeals Council issued an Order vacating the decision of the Commissioner and remanding to an ALJ for reevaluation of the medical opinions and Stanzione's RFC, and to obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on Stanzione's occupational base.  (AR 638–40.)

A second administrative hearing was held before ALJ Merrill on April 17, 2013. (AR 539–608.)  The ALJ stated on the record that the hearing was "to clarify the vocational testimony and it looks like due to a typo."  (AR 541.)  Stanzione again appeared and testified, and was represented by counsel.  A VE also testified at the hearing.  On May 22, 2013, the ALJ issued a decision again finding that Stanzione was not disabled under the Social Security Act from December 28, 2008, through the date of the decision.  (AR 520–31.)  Thereafter, the Appeals Council denied Stanzione's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 506–09.)  Having exhausted his administrative remedies, Stanzione filed the Complaint in this action on October 22, 2014.  (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Stanzione had not engaged in substantial gainful activity since his alleged disability onset date of December 28, 2008. (AR 522.) At step two, the ALJ found that Stanzione had the severe impairments of ADHD by history, learning disorder, and alcohol abuse in remission.

(*Id.*)  Conversely, the ALJ found that Stanzione's PTSD, compulsive behavior, thyroid condition, obesity, obstructive sleep apnea, back pain, and learning disorder were nonsevere.  (AR 523–24.)  At step three, the ALJ determined that none of Stanzione's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 524.)

Next, the ALJ determined that Stanzione had the RFC to perform "a full range of work at all exertional levels," but with the following nonexertional limitations:

> [H]e has sufficient understanding and memory for 1 to 3 step instructions; has sufficient concentration, persistence[,] and pace to sustain for two[-]hour bocks of time through the work day [and] work week in one[-]to[-][three][-]step work activities, is capable of routine interactions with the public, co-workers[,] and supervisors, can manage changes expected in routine work activities, is aware of hazards, can travel, and can plan and set goals.

(AR 525.)  Given this RFC, the ALJ found that Stanzione was capable of performing his past relevant work as a store laborer and a concrete company laborer.  (AR 529.) Alternatively, the ALJ determined that there were other jobs existing in significant numbers in the national economy that Stanzione could perform, including the representative occupations of cleaner and salvage laborer.  (AR 530.)  The ALJ concluded that Stanzione had not been under a disability from the alleged disability onset date of December 28, 2008 through the date of the decision.  (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

7

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Stanzione argues that the ALJ erred in failing to follow this Court's Remand Order and failing to properly analyze the medical opinions.  He requests that the Court reverse the Commissioner's denial of disability benefits and remand solely for calculation of benefits.  The Commissioner opposes Stanzione's substantive arguments, but does not respond to the request to remand solely for calculation of benefits.  The Court finds in favor of Stanzione on the substantive issues, but remands for further proceedings and a new decision rather than merely for a calculation of benefits, as explained below.

## I.     The ALJ failed to comply with the Court's Remand Order.

At the beginning of the second administrative hearing, the ALJ stated: "This matter is before me on remand to clarify the vocational testimony and it looks like due to a typo."  (AR 541.)  The ALJ's most recent May 2013 decision reflects such a limited reconsideration of Stanzione's claim, as it contains very few substantive changes from the initial February 2011 decision.  (*Compare* AR 7–16 *with* AR 520–31.)  But the Court's April 2012 Remand Order specifically states that Stanzione's claim was remanded for the ALJ's reconsideration of two substantive issues which were *not* reconsidered in the ALJ's 2013 decision: (1) Stanzione's RFC, and (2) "the weight to be afforded [to] all relevant parts of the . . . medical opinions."  (AR 570–71.)  Likewise, the Appeals Council's June 2012 Order states that, on remand, the ALJ will "[g]ive further consideration to [Stanzione's] maximum [RFC] during the entire period at issue[,] and . . .[,] [i]n so doing, [will] evaluate the treating, nontreating, and nonexamining source opinions in accordance with the [applicable regulatory] provisions . . . and Social

Security Rulings . . . , and explain the weight given to such opinion evidence." (AR 639.) Clearly, both the Court's Remand Order and the Appeals Council's Order directed the ALJ to reconsider the medical opinions and Stanzione's RFC on remand. And yet the ALJ failed to do so, instead merely correcting a typographical error from the initial decision and making an alternative finding at step five.

The Court finds that the ALJ erred in failing to follow the directives of the Appeals Council's Order on remand. *See* 20 C.F.R. § 416.1477(b) ("The [ALJ] shall take any action that is ordered by the Appeals Council . . . ."). Additionally, the ALJ's failure to follow the dictates of the Court's Remand Order–regarding the medical opinions and Stanzione's RFC in particular–is reversible error. *See Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) ("Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review."); *Brachtel v. Apfel*, 132 F.3d 417, 419–20 (8th Cir. 1997) ("The 'law of the case' doctrine . . . applies to administrative agencies on remand. Thus, if the District Court actually found that [the claimant] needed to lie down, the ALJ would be bound by that finding.") (internal quotation marks and citations omitted); *Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1217 (C.D. Cal. 2005) ("ALJs have acknowledged throughout the years that the remand instructions they receive from the federal district court are the law of the case.") (emphasis omitted); *Freegard v. Comm'r of Soc. Sec.*, No. 1:14–cv–34–jgm–jmc, 2015 WL 471703, at *5 (D. Vt. Feb. 4, 2015). Even though the Court's Remand Order was the product of a voluntary remand that was stipulated to by the parties, the ALJ was still required to follow its terms. In fact, the voluntary nature of the remand obliges the

10

Commissioner to comply with the terms of the Remand Order even more than if the remand was not voluntarily agreed to.  Stanzione astutely states: "The Commissioner's position is . . . weakened by the fact that it was the Commissioner who sought remand for the specific items in the Remand Order (the Commissioner actually drafted the Remand Order)[,] and now presents a *volte-face* [by] argu[ing] that there are no deficiencies in the ALJ's analysis of those [very same items]."  (Doc. 16 at 2.)

Notwithstanding the ALJ's improper failure to follow the directives of both the Court's Remand Order and the Appeals Council's Order, the crucial inquiry remains whether the ALJ complied with the applicable legal standards and whether substantial evidence supports the ALJ's decision.  *Cijka v. Comm'r of Soc. Sec.*, No. 2:13 CV 173, 2014 WL 1758143, at *6 (D. Vt. Apr. 29, 2014) (citing *Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1134 (D. Or. 2009)).  As discussed below, the Court finds that the ALJ's analysis of the medical opinions and RFC determination do not comply with the applicable legal standards and are not supported by substantial evidence; thus, remand is required.

II.    **The ALJ erred in his analysis of the medical opinions.**

A.    **Opinions of Robert Linder, MD and Patricia Stone, PhD**

In May 2009, the Vermont District Court referred Stanzione to psychiatrist Robert Linder, MD, to assist in determining whether Stanzione was mentally competent to stand trial and legally insane at the time of the commission of the burglary and petty larceny. (AR 318–26.)  After examining Stanzione for two hours and reviewing the medical record (AR 318), Dr. Linder opined that Stanzione was mentally competent to stand trial

for the offenses (AR 324) and was not legally insane at the time of the crimes (AR 326).

Dr. Linder made several significant opinions in his report, however, which are relevant to

the disability analysis.  Specifically, Dr. Linder stated that Stanzione had "paranoid

distortions" and that Stanzione's "understanding becomes compromised at times due to

his paranoid tendencies."  (AR 325.)  Dr. Linder continued: "[Stanzione] has had

difficulties at jobs, with his brother, with the investigator[,] and with this examiner when

he has felt people were against him in some manner[,] likely due to distortions in his

thinking."  (*Id.*)  Dr. Linder further stated that Stanzione "has experienced anxiety,

depression, anger, [and] paranoia[,] and he displays some compulsive behaviors.  His

diagnostic profile would likely include [PTSD] with the potential of the severity of his

symptomatology bordering on a psychosis at times."  (AR 325–26.)  With respect to

Stanzione's cognitive abilities, Dr. Linder found that Stanzione "may have had a

Learning Disorder and may have intellectual limitations in the borderline range."

(AR 326.)  Dr. Linder concluded that Stanzione's "host of difficulties compromises his

successful adjustment in the community as noted particularly by his spotty job history."

(*Id.*)

In September 2009, Stanzione was evaluated by psychologist Patricia Stone, PhD,

again in connection with the same criminal case, "because of concerns that he has severe

deficits in cognitive functioning, as well as in mental health."  (AR 327.)  Dr. Stone

completed 10 hours of clinical interviews with Stanzione, and administered a number of

psychological tests; she also reviewed Dr. Linder's report and the records of Stanzione's

treating psychiatric nurse practitioner, and interviewed Stanzione's sister[2].  (AR 327–31.)

In contrast to Dr. Linder, Dr. Stone opined that Stanzione was "incompetent" to function

within the legal system.  (AR 333.)  Dr. Stone explained that "[t]here is certainly very

strong evidence, in cognitive and basic skills assessments, to document that [Stanzione]

does have significant cognitive limitations in language, working memory[,] and

processing speed."  (AR 332.)  Dr. Stone found that Stanzione had "severe" limitations in

"reading comprehension, listening comprehension, social problem solving, and even

functional or consumer math skills," and suffered from "a high level of depression,"

experienced "major stress from feelings of belittlement and misunderstanding," and

"definitely has a distorted [and paranoid] outlook."  (*Id.*)  She further found that

Stanzione would be "at a severe disadvantage," resulting in "tremendous stress as he

attempts to cope with a world that is far beyond his skill levels" (*id.*), and that "[his]

entire lifespan suggests a severe level of impairment" (AR 333).

> In her report, Dr. Stone described Stanzione as follows:
>
> [Stanzione] shows [a] significant level of anxiety, tension, rumination about
> anticipated misfortunes.  He showed impairment associated with fears and
> traumatic stress.   Prominent dysphoria was exhibited; despondency,
> withdrawal, moodiness, and general dissatisfaction.  Paranoid ideation was
> seen in his overly suspicious and hostile [and] distrustful outlook.  He does
> show potential[] for delusional thinking within this profile, because of its
> extreme nature.  He is not only impulsive, but emotionally labile [and] feels
> misunderstood, although he, himself, does not understand what others say

---

[2]  Stanzione's sister told Dr. Stone that Stanzione was "always on edge and paranoid," "can be
very irritable and argumentative," "has difficulties expressing himself," "does not get along well with
people," and "has been a loner throughout his development."  (AR 329.)  Stanzione's sister further stated
that "she would not feel safe leaving [her children, ages three and six,] with [Stanzione] alone, because
they might say something that would trigger an angry outburst.  Although he has not been physically
assaultive, when he gets very angry, he has thrown things about the house and yells loudly."  (*Id.*)

to him.  He cannot maintain close relationships and has pulled himself away from people.  He is suspicious while, at the same time, highly anxious and needy.  Worry, rumination[,] and unhappiness, stemming from life's stressors, are prominent throughout this profile.  He has a great deal of difficulty thinking, concentrating[,] and making decisions.

(*Id.*)  Dr. Stone found that Stanzione's "overall profile" shows that, among other deficiencies, he is "severely depressed," agitated, has low self-esteem, has difficulty concentrating and making decisions, and is preoccupied and anxious.  (*Id.*)  Dr. Stone stated that she "feels very strongly that [her] in-depth psychological evaluation [of Stanzione] supports" diagnoses of Major Depression, Anxiety Disorder, PTSD, and Schizoaffective Disorder, and also shows indications of Dependent Personality Disorder, ADHD, and Learning Disability.  (*Id.*)  She stated that this combination of disorders "is having a devastating impact on [Stanzione's] functioning, in general."  (*Id.*)

The ALJ gave "limited weight" to the opinions of both Dr. Linder and Dr. Stone, on the grounds that their reports "were made not to assess [Stanzione's] work capacity but for an opinion on competence to stand trial."  (AR 524.)  This is not a good reason, in and of itself, to afford limited weight to the opinions of examining medical consultants, and does not reflect that the ALJ considered the applicable regulatory factors in assessing the value of these opinions.  *See* 20 C.F.R. § 404.1527(b), (c), (e) (requiring ALJ to "always consider the medical opinions in [the] case record" and to evaluate "every medical opinion" received, whether obtained from treating or consulting sources, considering several "factors," including but not limited to the opinion's supportability, consistency with the record, and whether the opinion is from a specialist).  Had the ALJ performed the required analysis, he would have discerned that several factors favor assessing more than "limited" weight to the

opinions of Dr. Linder and Dr. Stone (AR 524), who are considered "acceptable medical sources" under the regulations. *See* 20 C.F.R. § 404.1513(a) ("acceptable medical sources" include licensed physicians and licensed or certified psychologists).

First, contrary to the ALJ's rationale in his decision (*see* AR 524) and the Commissioner's assertion in her brief (*see* Doc. 15 at 17–18), the context of the opinions makes them more, not less, valuable: the fact that Dr. Linder and Dr. Stone were called upon by the Vermont District Court and Stanzione's attorney in a criminal case to opine on whether Stanzione was competent to stand trial and legally sane at the time of the alleged offenses, reflects a concern from professionals not involved in the disability process about Stanzione's mental health and cognitive abilities. Second, the opinions of Dr. Linder and Dr. Stone are based on extensive psychological testing, and Dr. Linder and Dr. Stone each specialize in mental health, Dr. Linder being a psychiatrist and Dr. Stone a licensed psychologist. Third and most importantly, the opinions of Dr. Linder and Dr. Stone are substantially similar with each other and consistent with the opinions of Stanzione's treating medical providers, including NP Berman, Vivian Calobrisi, PAC (physician's assistant, certified), Gretchen Lewis, LCMHC (licensed clinical mental health counselor), and Elliot Kaufman, MD, as discussed below.

### B.       Opinions of Wendy Berman, APRN

NP Berman was Stanzione's treating psychiatric nurse practitioner from around January 2008 until she retired in early 2011, regularly treating Stanzione in therapy sessions during that period. (*See* AR 263–92, 388–93, 444–48, 474–78, 550, 787–89.) In October 2010, Berman stated in a treatment note that Stanzione "can have a very explosive disorder

15

which he has show[n] in session on a couple of occasions," and that Stanzione had "[s]ome continuing issues with paranoia around medical issues . . . [and] thoughts that people are talking about him."  (AR 789.)  In the same month, Berman submitted a Medical Source Statement (MSS) regarding Stanzione's mental health impairments, wherein she opined that Stanzione met the characteristics for an anxiety-related disorder and an affective disorder characterized by a disturbance of mood accompanied by a full or partial manic or depressive syndrome as evidenced by paranoid thinking, and had "marked" difficulty in maintaining social functioning; "moderate" difficulty in maintaining concentration, persistence, or pace; and "moderate" restrictions in activities of daily living.  (AR 474–77.)  Berman further noted that Stanzione was "unable to focus w[ith] intermittent explosive disorder." (AR 478.)

The ALJ gave "limited weight" to Berman's opinions, on the grounds that Berman is "not a medically acceptable source," and "her assessment is not supported by her own notes."  (AR 528.)  Although it is true that Berman, a nurse practitioner, is not an "acceptable medical source" under the regulations, *see* 20 C.F.R. § 404.1513(a), the ALJ was still required to apply the relevant regulatory factors and provide a reasonable explanation for his decision to afford limited weight to her opinions, *see id.* at (d)(1); *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010).  Social Security Ruling (SSR) 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources," including nurse practitioners, to show the severity of a claimant's impairments and how they affect his or her ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  The Ruling further states that

16

medical sources like nurse practitioners "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at \*3. Thus, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* SSR 06-03p directs ALJs to use the same factors for evaluating the opinions of medical sources who are not "acceptable medical sources" as are used for evaluating "acceptable medical sources," including: (1) whether the source is a specialist or an expert in the area related to the claimant's impairment; (2) how long the source has known and how frequently the source has seen the claimant; (3) whether the source explains and presents relevant evidence to support her opinion; (4) how consistent the source's opinion is with other evidence; and (5) any other factors tending to support or refute the opinion. *Id.* at \*4–5.

The ALJ failed to apply these factors in weighing Berman's opinions; yet two key factors favor affording significant weight to them. First, Berman had an extensive treating relationship with Burdick; and second, Berman's opinions are consistent with the record as a whole, including the medical opinions of examining consultants Dr. Linder and Dr. Stone and treating providers PA Calobrisi, mental health counselor Lewis, and Dr. Kaufman. Berman's opinions are even partially consistent with those of nonexamining agency consultant William Farrell, PhD, who opined that Stanzione "should be limited from intensive interaction with the general public [and] harsh supervisors and coworkers." (AR 423.) Moreover, the ALJ's finding that Berman's opinions are "not supported by her own [treatment] notes" (AR 528) is itself unsupported. The only specific example provided

by the ALJ to explain this finding is that Berman stated in treatment notes that Stanzione
"'is still without a job'" and "'still has not found work.'"  (*Id.* (quoting AR 774–89).)  These
are accurate quotations from Berman's treatment notes (*see* AR 788, 789); but it is unclear
how these statements render Berman's opinions regarding Stanzione's mental health
deficiencies unsupported.

A review of Berman's treatment notes and opinions reveals that she did not believe
Stanzione was capable of full-time work or that his mental health symptoms had resolved
such that he should have made attempts to return to work.  For example, in the treatment
note where Berman stated that Stanzione "still has not found work," she also stated that
Stanzione "continues to have issues with paranoia[, thinking] that people are talking about
him [and] saying bad things about him, which . . . makes it difficult to leave the house."
(AR 788.)  Berman concluded that Stanzione "will have difficulty finding work until he can
control his anger," and noted that she increased his Risperdal "in hopes of targeting the
paranoia and irritability."  (*Id.*)  Other treatment notes of Berman support her opinions as
well.  (*See, e.g.*, AR 266 ("[m]ood anxious," "anger issues still persist," "[l]imited insight
[and] judgment"), 267 ("[c]ontinues w[ith] some paranoid thinking–people talking about
him," "[w]orrying excessively about health issues"), 270 (had a "big argument" with his
sister, "[t]his is an ongoing issue for [him][; i]t has cost him employment x3"), 280 ("recent
confrontation" with work supervisor, resulting in him being suspended for a day), 448
("[i]mpulsivity, irritability[,] and agitation still problematic"), 789 ("can have a very
explosive disorder which he has show[n] in session on a couple of occasions," "[i]nsight and
judgment are limited," "[t]hought process filled with cognitive distortions").)  The ALJ

erred in failing to consider and provide a reasoned rejection of these treatment notes, which in fact support Berman's opinions that Stanzione's mental health impairments severely limited his ability to function. *See Fiorello v. Heckler*, 725 F. 2d 174, 176 (2d Cir. 1983) ("Although we do not require that . . . an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor") (citation omitted); *Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (ALJ "cannot pick and choose evidence that supports a particular conclusion" and must "acknowledge relevant evidence or . . . explain its implicit rejection").

### C.     Opinions of Vivian Calobrisi, PAC, and Gretchen Lewis, LCMHC

The ALJ also failed to properly evaluate the opinions of Vivian Calobrisi,[3] PAC, a physician's assistant who treated Stanzione starting in February 2010 (*see* AR 456–63, 757–73) and Gretchen Lewis, LCMHC, a mental health counselor who treated Stanzione starting in July 2012 (*see* AR 550–51, 790–805).  Calobrisi treated Stanzione for depression, hypertension, and hypothyroidism.  (AR 461.)  In October 2010, Calobrisi completed a MSS regarding Stanzione, wherein she opined that Stanzione's exertional limitations were less than sedentary (AR 494), and that Stanzione would be expected to be absent from work due to his history of depression, ADHD, and chronic back injury (AR 496).  Calobrisi further noted that Stanzione suffered fatigue as a side effect of taking Risperdal and due to his depression, and was inattentive due to his ADHD.  (AR 497.)

---

[3] PA Calobrisi's name is misspelled both in the administrative record and in the ALJ's decision. (*See, e.g.*, AR 497, 528.)

19

July 2012 treatment notes from counselor Lewis indicate that, although Stanzione "seem[ed] incredibly insightful and motivated to get better," his eye contact, grooming, and posture were poor; he appeared anxious, worried, agitated, depressed, and numb; his affect was constricted; his thought content was both normal and paranoid; and he was having some sleep disturbance. (AR 805.) Lewis noted that Stanzione "picks at his legs, arms[,] and scalp," leaving "big sores that scab over and then he wants to pick at them." (*Id.*) She further noted that Stanzione was paranoid, had "angry rages," and was "angry about company at his home." (*Id.*) In a December 2012 treatment note, Lewis observed that Stanzione was "still picking at his body and digging deeply," and stated that, although Stanzione felt he was using some of the skills learned in counseling and seemed to really want to change, he had "few internal resources." (AR 796.) A few weeks later, in January 2013, Lewis stated that Stanzione was "still digging at himself horribly," but was "getting better with his thoughts." (AR 795.)

In March 2013, Lewis opined in a MSS that Stanzione met the characteristics for an anxiety-related disorder and an affective disorder characterized by a disturbance of mood accompanied by a full or partial manic or depressive syndrome as evidenced by paranoid thinking, sleep disturbance, hyperactivity, easy distractibility, and numerous other symptoms. (AR 807.) Lewis further opined that Stanzione had "extreme" restrictions in activities of daily living, difficulty in maintaining social functioning, and difficulty maintaining concentration, persistence, or pace. (AR 809.) Lewis noted that Stanzione had "[s]evere social withdrawal" (AR 813), and would "most likely" respond to coworkers, supervisors, and the general public "with irritability and anger[,] possibly walk[ing] off the

job as he has [done] in the past," and "would misinterpret his coworkers [and] supervisors['] intentions" (AR 810).  Lewis further opined that Stanzione had a "substantial loss of ability" in all job functioning due to his severe anxiety, ADHD, paranoid thinking, PTSD, difficulty thinking, sleeping issues, poor memory, lack of concentration and focus, and poor self-esteem.  (AR 811.)  Lewis concluded: "[Stanzione's] loss of ability is so substantial that he should not be considered [able] to work at all" (AR 811).

As with the opinions of Dr. Linder, Dr. Stone, and NP Berman, the ALJ gave "limited weight" to the opinions of PA Calobrisi and counselor Lewis, on the grounds that they are not supported by each provider's own treatment notes and the record as a whole. (AR 528, 529.)  The ALJ also reasoned that Calobrisi is "not an acceptable medical source." (AR 528.)  The ALJ's analysis fails for the same reasons discussed above with respect to the opinions of NP Berman, most notably that the ALJ failed to consider the regulatory factors, including the opinions' consistency with each other and with the other medical opinions of record.  Moreover, even though Calobrisi is a physician's assistant and thus, like NP Berman, not an "acceptable medical source" under the regulations, *see* 20 C.F.R. § 404.1513(a), the ALJ was still required to consider the applicable factors in assessing the weight of her opinions, *see* SSR 06-03p, 2006 WL 2329939, at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).

### D.     Opinions of Elliot Kaufman, MD

Finally, the ALJ erred in his analysis of the opinions of Dr. Kaufman, Stanzione's treating psychiatrist beginning in January 2008.  (AR 263–65, 444–46, 550.)  In Dr. Kaufman's initial assessment of Stanzione (which is signed by both Dr. Kaufman and

21

NP Berman, who assisted Dr. Kaufman at Northeast Kingdom Human Services), it was

noted that Stanzione's speech was pressured; his affect was flat; his mood was anxious; and

he reported decreased sleep, energy, and concentration.  (AR 265, 446.)  Dr. Kaufman and

NP Berman's impression was that Stanzione had been "having difficulty with depression"

and "has had a long history of generalized anxiety disorder and social phobia."  (*Id.*)

Dr. Kaufman's treatment notes from May 2011 to January 2013 consistently reference

Stanzione's irritability, decreased focus, nightmares, and auditory hallucinations (referred to

as "A/H" in treatment notes).  (*See* AR 774–86.)

     In April 2013, Dr. Kaufman completed a MSS, wherein he stated that Stanzione had

an anxiety-related disorder characterized by motor tension, hyperactivity, a persistent

irrational fear, recurrent obsessions or compulsions, hallucinations, and paranoid thinking.

(AR 814–15.)  Dr. Kaufman further stated that Stanzione had "marked" limitations in social

functioning and maintaining concentration, persistence, or pace.  (AR 817.)  He assessed

Stanzione as having serious limitations in his ability to interact with coworkers, supervisors,

and the general public, and explained that, if placed in a work setting, "I would expect

[Stanzione] to become overwhelmed with anxiety and very possibly to either withdraw or

become angry or violent" several times each day.  (AR 818.)  Noting that a psychological

evaluation from 1996 "aptly described" Stanzione in the present day (AR 822),

Dr. Kaufman found that there seemed to be little, if any, significant change in Stanzione's

condition "over the years" (AR 821).  Dr. Kaufman concluded that "[t]he best work

environment [for Stanzione] would be in a sheltered setting[,] which is not present in any

typical work place," and thus, he did not believe Stanzione was employable in a competitive work setting.  (AR 822.)

The opinions of a treating physician, like Dr. Kaufman here, are generally entitled to more weight than other evidence.  In fact, under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Even when a treating physician's opinions are not given controlling weight, the regulations require the ALJ to consider the factors discussed above–including the length of the treatment relationship, the frequency of examination, whether the opinions are supported by relevant evidence and consistent with the record as a whole, and whether the physician is a specialist in the medical area addressed in the opinions–in determining how much weight they should receive.  *Id.* at § 404.1527(c); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  In addition, the regulations provide that the ALJ "will always give good reasons in [his] . . . decision for the weight [he] give[s] [to the claimant's] treating source's opinion."  20 C.F.R. § 404.1527(c)(2); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).  "The failure to provide '"good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.'"  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess*, 537 F.3d at 129–30).

The ALJ afforded "limited weight" to Dr. Kaufman's opinions, explaining that they "rel[y] on his review of a 1996 evaluation, 12 years prior to [Stanzione's] alleged onset date," and they are not supported by the record as a whole including Dr. Kaufman's own

treatment notes.  (AR 529.)  The ALJ's finding that Dr. Kaufman's opinions are unsupported by the record is contrary to the evidence, as discussed above.  In fact, Dr. Kaufman's opinions are supported by and consistent with the medical opinions of Dr. Linder, Dr. Stone, NP Berman, PA Calobrisi, and counselor Lewis.  Moreover, it was not error for Dr. Kaufman to remark that Stanzione is "aptly described" in a psychological evaluation conducted in 1996: the remark apparently was meant to reflect the severity of Stanzione's mental health problems and the fact that Stanzione has been unable to change in nearly two decades.  The 1996 evaluation was clearly not the only basis of Dr. Kaufman's opinions, given that Dr. Kaufman himself treated Stanzione since 2008 and given Dr. Kaufman's reference to other evaluations as well in his MSS (*see* AR 821 ("Based on evaluations done over the years[,] there seems to be little if any significant change.")).

The ALJ also states that some of Dr. Kaufman's treatment notes "contain[] different handwriting," despite being signed by Dr. Kaufman, implying that Dr. Kaufman's treatment notes are deserving of less weight because they were not prepared by Dr. Kaufman himself. (*Id.*)  The record simply does not support this finding (*compare* AR 776 *with* AR 784), and the ALJ makes no attempt to explain it with any specificity.  The ALJ also notes that Dr. Kaufman's treatment notes indicate that Stanzione was in partial symptom remission in May 2011 and May 2012.  (AR 529.)  But Dr. Kaufman still opined, *in April 2013*, that Stanzione had severe limitations in mental functioning (*see* AR 814–22), thus indicating the Doctor's belief that, despite partial remission, Stanzione was nonetheless not able to function well.  *See Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) ("[i]t is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not

24

mean that the disability has ceased") (internal quotation marks omitted).  Moreover, in a July 2011 treatment note, Dr. Kaufman reveals that "partial remission" does not equate to normal functioning.  (AR 786.)  The Doctor states: "ADHD in partial symptom remission.  Overall functioning may be at baseline but is modest at best.  Review of psychological testing also points to a rather pervasive set of problems and the diag[nosis] of schizoaffective disorder."  (*Id.*)

Accordingly, the ALJ failed to properly analyze the opinions of Dr. Kaufman, counselor Lewis, PA Calobrisi, NP Berman, Dr. Stone, and Dr. Linder.  This failure necessarily affected the ALJ's RFC determination.  Thus, the Court once again remands Stanzione's claim, directing the ALJ to afford more weight to these treating source and examining consultant opinions.[4]

## III.    Reversal for a calculation of benefits is not appropriate.

Stanzione asks that the matter be remanded solely for a calculation of benefits, rather than for further proceedings.  In cases where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," reversal for a calculation of benefits may be appropriate.  *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).  Courts have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further proceedings "would serve no purpose."  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).  Where, however, there are

---

[4]  Given that remand is required to reanalyze the medical opinions and redetermine Stanzione's RFC, the Court need not address the argument raised for the first time in Stanzione's Reply that the Commissioner and ALJ "have placed misguided and inappropriate reliance on statements made by one of Mr. Stanzione's former employers."  (Doc. 16 at 8; *see* AR 232–34, 525.)

gaps in the administrative record or the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision. *Rosa*, 168 F.3d at 82–83; *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Here, it cannot be said that a remand for further proceedings would serve no purpose. Once the ALJ reanalyzes the medical opinions and makes a new RFC determination, further testimony from a VE will be required to determine what, if any, jobs Stanzione can do and whether they exist in significant numbers in the national economy. Accordingly, remand for further proceedings and a new decision is required.

## Conclusion

For these reasons, the Court GRANTS Stanzione's motion (Doc. 12), in part; DENIES the Commissioner's motion (Doc. 15), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 11th day of January, 2016.

/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge